**RUSSELL et al. v. UNITED STATES.**

No. 44189.

Court of Claims.

May 5, 1941.

George D. Brabson, of Washington, D. C. (R. S. Doyle and Blair & Korner, all of Washington, D. C., on the brief), for plaintiffs.

Joseph H. Sheppard, of Washington, D. C., and Samuel O. Clark, Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

**446**

WHALEY, Chief Justice.

Henry L. Russell, a resident of Holyoke, Massachusetts, died on March 5, 1935, from an acute infection of the kidneys. The Commissioner of Internal Revenue assessed additional estate taxes upon the ground that certain transfers, prior to his death, were made in contemplation of death and should be included in the taxable estate under Section 302 of the Revenue Act of 1926, c. 27, 44 Stat. 9, 26 U.S.C.A. Int.Rev. Acts, page 227. The amount of the additional tax was paid by the executors and claim for refund was filed. The refund claim was rejected by the Commissioner and the executors brought this suit to recover the amount paid.

The decedent died at the age of seventy-three years, leaving surviving him his wife and three children, two sons and one daughter, his oldest son having died in 1934.

When a young man, Henry L. Russell and his father established a hardware and machinery business and through hard work and diligent efforts they built up the business to one of the largest hardware and machinery businesses in New England. Decedent had his sons trained in electrical courses at engineering colleges. He was extremely industrious and conscientious and expected the same sort of conduct in his family and everyone associated with him. Decedent's desire was to have his three sons enter the business which he had so strenuously built up and successfully established. One of the sons worked for his father and the other two sons went to war, returning from France in 1919 when they resumed work with their father. The business, stimulated by war transactions, grew enormously. The decedent expressed the desire, time and time again, to his sons to have them go into business with him, if they showed a capacity to manage it, as he wanted them to work together. After the sons had been working with him for a short time, in January 1920, the decedent organized a partnership of the business of J. Russell & Company and transferred to each of his sons a ³⁄₂₀ interest in the business and retained the balance of ¹¹⁄₂₀. Decedent required his sons to give him notes in the amount of $60,000 each, bearing interest at 6 per cent. The amount of the notes was fixed by the father and there was no negotiating or bargaining between them. In 1923 the partnership was incorporated and

each son received ³⁄₂₀ of the stock, or 750 shares, totalling 2,250 shares for the sons and the decedent received 2,750 shares. In 1924 decedent made to each of his sons a Christmas gift of $25,000 by way of canceling that amount from each of the three $60,000 notes which they had given to him. In October 1925 the decedent established a trust for his daughter of certain stocks and bonds having a value of $40,000. The daughter was not to receive the principal, but only the interest, until she reached the age of thirty-five years.

Decedent was a vigorous and strong man who had always led an active life. On July 1, 1928, he suffered a stroke of paralysis resulting from a cerebral hemorrhage and was unconscious for a week or more. After a month he was able to stand and walk a little with support, and in about two or more months he was able with support to go downstairs in his home. The effect of the stroke was the paralysis of the right arm, right leg, and the loss of the power of speech. A registered nurse remained with him, day and night, sleeping in his room and accompanying him wherever he went. Until his death, a registered nurse was always with the decedent.

After the decedent had made some small progress in recovering from the first stroke he had a second stroke on October 8, 1929, which rendered him unconscious for several hours and required that he be confined to his bed for a week. Decedent never regained the full use of his right arm or leg, nor his power of speech other than to make articulate sounds after months of coaching. In July 1929 the decedent cancelled $14,000 from each of the $60,000 notes heretofore referred to and required the sons to liquidate the balance on the notes and to pay the interest which remained due thereon.

After his second stroke in October 1929 the decedent established four trusts for his daughter and his three daughters-in-law, each trust consisting of securities in the value of $3,112.50. In February 1930, decedent gave to each of his three sons 800 shares of stock in J. Russell & Co. The result of these gifts was that each son had 1,550 shares of the capital stock of 5,000 shares, leaving only 350 shares to the decedent which he retained until his death. In November 1930 decedent created a realty trust known as the Henry L. Russell Realty Trust for the benefit of

his wife and four children. In March 1931 he transferred to his wife certain securities valued at $252,658.25.

We have only to consider the transfers made by the decedent after the second stroke in October 1929. The Commissioner of Internal Revenue has not included in the decedent's gross estate the $14,000 which was given to each of the three sons and applied to their notes in July 1929, the Commissioner having found that only the transfers to the daughter and the daughters-in-law, the transfers of 800 shares of stock to each of the sons, the realty trust to his wife and four children, and the transfer of securities to his wife were made in contemplation of death. The burden is on the plaintiffs to establish by the preponderance of evidence that the decision of the Commissioner of Internal Revenue is erroneous.

In our judgment, the plaintiffs have failed to overcome this presumption. It will be seen from the facts in this case that the decedent, during his entire life, made relatively small gifts to his wife, and, prior to his sudden and unexpected paralytic stroke in 1928, only small gifts to his sons and daughter, although he was a very rich man and had a very prosperous and successful business. These amounts given to his four children were small in comparison to what decedent possessed and allowed them only a small income for the support of themselves and their families. The evidence does not disclose that the decedent made any gifts of property or securities to his wife until after he had his second stroke. It is true that he desired, as every male parent does who has built up a successful business by hard work and diligence, to have his sons enter the business and to carry it on in future years. But, there is nothing to show that there was any well-considered or established plan on his part to divest himself of any interest in the business, prior to his stroke, whereby he was to part with the control of his business. When decedent died in 1935 he left a gross estate, excepting these gifts, of $299,191.67. If these gifts, above referred to, had not been excluded, the gross estate would have been $803,866.29. Therefore, decedent, gave away approximately two-thirds of his property to his wife and children after he had suffered a second stroke of paralysis and when he had not been able to speak for a year and had not had the full use of his right arm and leg.

It is contended by the plaintiffs that decedent was of a bright, cheerful disposition; that his mind was clear; and that he did not believe he was going to die or that he was in a very serious condition. It is impossible to reconcile this view with the fact that, after his first stroke in July 1928 until the day of his death, decedent could not speak other than make a few articulate sounds. There is nothing in the evidence to show that he ever wrote anything except his name to the documents transferring property. During all of this period while decedent was afflicted with lack of speech, lack of the use of his right arm and leg, and was dependent upon a trained nurse for support and attention constantly day and night, there is not a single line of evidence to show that he read a paper or magazine or had a paper or magazine read to him. Decedent may not have thought that death was imminent, but a man, with as keen a mind as his before he was stricken, must have known that he was in a serious condition and in a doubly serious condition after his second stroke.

The question before us is whether these gifts were made as substitutes for testamentary dispositions, and thus provide an evasion of the estate tax. We must determine the motive which induced the transfers.

As was said in the case of United States v. Wells, 283 U.S. 102, 116, 117, 118, 51 S.Ct. 446, 451, 75 L.Ed. 867:

"* * * Transfers in contemplation of death are included within the same category, for the purpose of taxation, with transfers intended to take effect at or after the death of the transferor. The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax. Nichols v. Coolidge, 274 U.S. 531, 542, 47 S.Ct. 710, 71 L.Ed. 1184, 52 A.L.R. 1081; Milliken v. United States, 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809, decided March 2, 1931. As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be 'contemplated,' that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition. As a condition of body and mind that

naturally gives rise to the feeling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are deemed to be the proper objects of his bounty, the evidence of the existence or nonexistence of such a condition at the time of the gift is obviously of great importance in determining whether it is made in contemplation of death. * * *

"As the test, despite varying circumstances, is always to be found in motive, it cannot be said that the determinative motive is lacking merely because of the absence of a consciousness that death is imminent. It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. Old age may give premonitions and promptings independent of mortal disease. Yet age in itself cannot be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than with death, may motivate the transfer. The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is 'near at hand.'

"If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts inter vivos which spring from a different motive. Such transfers were made the subject of a distinct gift tax, since repealed. * * * The purposes which may be served by gifts are of great variety. It is common knowledge that a frequent inducement is not only the desire to be relieved of responsibilities, but to have children, or others who may be the appropriate objects of the donor's bounty, independently established with competencies of their own, without being compelled to await the death of the donor and without particular consideration of that event. There may be the desire to recognize special needs or exigencies or to discharge moral obligations. The gratification of such desires may be a more compelling motive than any thought of death."

When it is taken into consideration that the decedent made no provision for his family, with the exception of the small amounts given to his sons and daughter, and no provision for his wife, previous to his sudden affliction, and then, after his second stroke, disposed of over half of his entire estate, it is impossible to arrive at any other conclusion, taking his mental and physical condition into consideration, than that the thought of death was the impelling motive for the transfers, thereby avoiding testamentary dispositions. Myers, Adm. v. United States, 2 F.Supp. 1000, 77 Ct.Cl. 429, certiorari denied, 292 U.S. 629, 54 S.Ct. 628, 78 L.Ed. 1483; Harris Trust & Savings Bank et al. v. United States, 29 F.Supp. 876, 90 Ct.Cl. 17, certiorari denied, 310 U.S. 632, 60 S.Ct. 1074, 84 L.Ed. 1402.

The determination of the Commissioner of Internal Revenue that the transfers to decedent's daughter and daughters-in-law, the transfers to his sons, the realty trust created for his wife and four children, and the transfer to his wife which constituted the material part of his estate, were made without adequate consideration of money or money's worth and were made in contemplation of death, we think, is correct.

The petition is dismissed. It is so ordered.